MANNING CURTIS BRADSHAW
& BEDNAR LLC
David C. Castleberry [11531]
dcastleberry@mc2b.com
136 East South Temple, Suite 1300
Salt Lake City, UT 84111
Telephone (801) 363-5678
Facsimile (801) 364-5678

*Attorneys for Plaintiff R. WAYNE KLEIN, the Court-Appointed Receiver of U.S. Ventures, LC, Winsome Investment Trust, and the assets of Robert J. Andres and Robert L. Holloway*

FILED
U.S. DISTRICT COURT

2014 APR 15 A 11: 13

DISTRICT OF UTAH

BY: ________
DEPUTY CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| R. WAYNE KLEIN, the Court-Appointed Receiver of U.S. Ventures LC, Winsome Investment Trust, and the assets of Robert J. Andres and Robert L. Holloway,<br><br>Plaintiff,<br><br>vs.<br><br>FORRES McGRAW,<br><br>Defendant. | ~~PROPOSED~~ **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT**<br><br>Case No. 2:12-cv-00102-BSJ<br><br>Judge Bruce S. Jenkins |

This matter came before the Court on a motion for summary judgment (the "Motion") filed by the Plaintiff R. Wayne Klein, court-appointed receiver for US Ventures LC, Winsome Investment Trust, and the assets of Robert J. Andres and Robert L. Holloway (the "Receiver") on February 20, 2014, doc. no. 52. The deadline for Defendant Forres McGraw ("McGraw") to file any memorandum in opposition to the Motion was March 24, 2014, but no opposition was filed. Therefore, the Court granted the Motion on April 1, 2014, and hereby enters the following findings of facts and conclusions of law as set forth below:

## FINDINGS OF FACT

1. The Receiver was appointed as receiver for US Ventures LC ("US Ventures"), Winsome Investment Trust ("Winsome"), and the assets of Robert J. Andres and Robert L. Holloway on January 25, 2011 in connection with an action filed by the Commodity Futures Trading Commission (the "CFTC") against U.S Ventures, LC ("US Ventures") in the United States District Court for the District of Utah, Case No. 2:11CV00099 BSJ ("CFTC Action").

### U.S. Ventures Operated as a Ponzi Scheme And Was Insolvent at the Time of the Transfers to McGraw

2. US Ventures, which was operated by Robert L. Holloway ("Holloway") operated as a fraudulent Ponzi scheme before the Receiver's appointment and was operating as a Ponzi scheme at the time of the transfers at issue. *See* Declaration of R. Wayne Klein ("Klein Decl."), attached as Exhibit 1 to the Motion, ¶¶ 2-43.

3. U.S. Ventures was insolvent throughout its operations, including when it made the transfers at issue to McGraw. *Id.*

4. Holloway admitted in contemporaneous email correspondence that he was lying to people "ever [sic] single day" in connection with U.S. Ventures, and Holloway also recognized that he could "go to jail" for his role in U.S. Ventures and repeatedly noted his stress and fears of being caught and losing money in the scheme. *See* a true and correct copy of February 28, 2006 email from Robert Holloway, attached as Exhibit 3 to the Motion; *see also* Excerpts from November 30, 2009, Deposition of Robert Holloway, in *SEC v. Novus Technologies LLC*, United States District Court for the District of Utah, Case No. 2:07-cv-00235, attached as Exhibit 4 to the Motion.

5. McGraw received $123,598.00 in transfers from US Ventures between December 19, 2005 and April 2, 2007. *See* Klein Decl. at ¶ 45, Exhibit 1 to the Motion. Indeed, McGraw

admits that the payments he received "can be derived from bank records already in Plaintiff's possession." Responses at Response to Interrogatory No. 2, Exhibit 6 to the Motion.

**McGraw's Services Provided to US Ventures Did Not Provide Value But Only Furthered the Ponzi Scheme**

6. McGraw provided no value to U.S. Ventures for the funds he received from U.S. Ventures. McGraw claims that the services he provided included that he "prepared a spreadsheet template program" and "prepared lengthy, detailed spreadsheets" for Holloway and U.S. Ventures that detailed the alleged trading gains from U.S. Ventures' activities and that were sent to investors. *See* Responses at Response to Interrogatory No. 4, attached as Exhibit 6 to the Motion.

7. Instead of providing value to U.S. Ventures or its investors, McGraw's services only furthered the effect of the Ponzi scheme by creating account statements that were based on false information and that were then sent to U.S. Ventures investors.

**McGraw Cannot Show that He Received Transfers From U.S. Ventures in Good Faith**

8. McGraw knew or should have known that U.S. Ventures was a fraudulent Ponzi scheme and he did nothing to investigate the business of U.S. Ventures, as is required to make a good faith showing when one is on notice of indicia of fraud.

9. For example, on September 25, 2005, McGraw agreed to act as U.S. Ventures' CFO, putting him in a position to know about and have fiduciary responsibilities to look into U.S. Ventures' fraud. *See* Email exchange September 25, 2005 between Forres McGraw and Bob Holloway, attached as Exhibit 8 to the Motion, where Holloway stated in an email sent at 12:03 p.m., "I would like to formally ask you to help me as CFO" and in an 4:25 p.m. email McGraw responded to Holloway by writing, "Sure to all".

10. On October 30, 2005, Robert Holloway requested that McGraw prepare daily return statements showing a 10% return for U.S. Ventures investments. McGraw responded the next day suggesting that a daily return document would not be wise, as it would require U.S. Ventures to also show a 30% loss on a particular day and that "people will freak out when they see a 30% loss." *See* October 30 and 31, 2005 e-mail exchange between Forres McGraw and Bob Holloway, attached as Exhibit 9 to the Motion. Thus, McGraw was aware of the drastic returns and losses that U.S. Ventures was purportedly making and was involved in planning ways to hide these facts from investors.

11. Holloway also asked that McGraw report a $0 change in U.S. Ventures accounts on October 31, 2005 when the trading actually resulted in a loss. When McGraw asked why he was to report $0 when there was actually a loss, Holloway stated that "we lost and have to carry losses ourselves." *Id.* McGraw recognized that "withholding that information from them could be a huge liability." *Id.* Despite this known concealment of a loss, the next day McGraw prepared calculations showing a 772% gain for U.S. Ventures over the prior 365 days. *See* November 1, 2005 email chain between Forres McGraw and Bob Holloway, attached as Exhibit 10 to the Motion.

12. On December 5, 2005, McGraw sent Holloway an email concerning Holloway's practice of using funds he had told investors were in "reserve" to trade. *See* December 5, 2005 email from Forres McGraw to Bob Holloway, attached as Exhibit 11 to the Motion. McGraw pointed out that if Holloway used such funds to trade, they were not truly in reserve, demonstrating McGraw's knowledge of Holloway's misrepresentations to investors. *Id.*

13. On February 3, 2006, McGraw sent Holloway an email discussing potential verification that "the returns reported on David's report are accurate." February 3, 2006 email

from Forres McGraw to Bob Holloway, attached as Exhibit 12 to the Motion. McGraw noted that such verification would "get off track if they want to verify that the beginning balance reported to account holders ties to the balance in the bank. Which, of course, it doesn't." *Id.* McGraw's suggestion to resolve this problem was to "explain this by describing it as an unfunded loss reserve." *Id.*

14. On February 21, 2006, McGraw had an exchange with Holloway regarding a meeting with Matt Striggles, an acquaintance of McGraw, regarding the U.S. Ventures investment. *See* February 21, 2006 email exchange between Forres McGraw and Bob Holloway, attached as Exhibit 13 to the Motion. Holloway was concerned and asked "[h]ow can we talk to him without pulling up skirt?" *Id.* McGraw noted that he has "set the stage" with Striggles "by telling him that you were eating the losses." *Id.* McGraw then suggested that "[i]f you have an unfunded loss reserve, you just have to convince him that the loss was the result of something that cannot happen again." *Id.*

15. On February 21, 2006, Holloway sent McGraw additional communications demonstrating the fraudulent nature of U.S. Ventures and Holloway's trouble keeping the fraud going. In those communications, Holloway made such comments as "[p]lease send me a gun to eat" and "I cannot deal with losses. I can't sleep, I am up until 4 or 5 am staring at ceiling. BFW all over... only I did it." February 21, 2006 email exchange between Bob Holloway and Forres McGraw, attached as Exhibit 14 to the Motion.

16. On March 2, 2006, McGraw wrote to Holloway to inform him that McGraw had changed the U.S. Ventures trading reports to show a "null" entry when an account had no earnings for a day, thus causing the reports for days of no earnings or losses to "not reduce the

daily average." March 2, 2006 email exchange between Bob Holloway and Forres McGraw, attached as Exhibit 15 to the Motion.

17. In an April 9, 2006 email, McGraw noted that U.S Ventures was providing "the best return available on the planet," despite his knowledge that he was manipulating the reports not to show losses. April 9, 2006 email from Forres McGraw to Bob Holloway, attached as Exhibit 16 to the Motion.

18. On June 22, 2006, McGraw had an email exchange with Holloway explaining McGraw's desire to set up "distribution rules" for U.S. Ventures, demonstrating McGraw's direct participation in U.S. Ventures' management. *See* June 22, 2006 email exchange between Forres McGraw and Bob Holloway, attached as Exhibit 17 to the Motion. Holloway responded to McGraw's inquiry by stating "[w]hat do you mean rules..." *Id.*

19. On October 1, 2006, Holloway sent an email indicating that he intended to have McGraw set up an offshore bank account for the "fees" Holloway was taking from his U.S. Ventures activities. *See* October 1, 2006 exchange involving Bob Holloway, Arnel Cruz, and Forres McGraw, attached as Exhibit 18 to the Motion.

20. On October 7, 2006, Holloway sent McGraw an email outlining Holloway's plan to "catch up" on $17 million that was lost from the U.S. Ventures accounts; Holloway told McGraw that he "[w]ould like to know what breakdown is to project covering my ass and doing real audit deal." October 7, 2006 email from Bob Holloway to Forres McGraw, attached as Exhibit 19 to the Motion; *see also* March 10, 2007 email exchange between Bob Holloway and Forres McGraw, attached as Exhibit 20 to the Motion (Holloway to McGraw stating "I will be able to catch up and do loss reserve easy within a month with no more investments").

21. On November 23, 2006, Holloway sent McGraw a draft email he planned to send to Robert Andres regarding the failing state of the U.S. Ventures scheme. Holloway's email noted that Chase bank had frozen U.S. Ventures funds, but that he had moved some funds to a different bank so that he could continue to use them. He then stated:

> Not that the above matters much but the trading program has gotten so far off track to what I originally planned I am finding myself wishing I had not done at all. The idea of me ever playing golf again much less playing the senior tour in a year is completely gone. I don't ever sleep, I am doing this almost round the clock, my marriage is completely stressed, and I feel I am anchored to the damn computer. I don't think I have ever been so exhausted or frustrated in my entire life.
>
> I originally wanted this set up as a way for me to trade my own funds, give my family a secure future, and be able to have quality time doing my stuff and spending time with lorraine. I have made some big mistakes along the way, made to many exceptions, and feel like a mouse on one of those wheels turning round and round. There is no possibility that my physical or mental state is going to hold up long range under this pressure. Dealing with yesterdays bs, having to hire an attorney to get funds back (could not even make payroll, plus they took every dime out of every one of my employees account that had a chase account going into thanksgiving) and dealing with this because someone else is just the start.

November 23, 2006 email from Bob Holloway to Forres McGraw, attached as Exhibit 21 to the Motion.

22. On November 16, 2006, McGraw made a suggestion that unmistakably identifies U.S. Ventures as a Ponzi scheme and demonstrates his knowledge of that fact. McGraw suggested that U.S. Ventures implement a rule to "allow withdrawals only when and if new money comes in to replace it." November 16, 2006 email from Forres McGraw to Bob Holloway, attached as Exhibit 22 to the Motion.

23. On November 29, 2006, Holloway sent to McGraw an email from Robert Andres regarding a potential investment Andres was soliciting. November 29, 2006 email chain

between Bob Holloway and Forres McGraw, attached as Exhibit 23 to the Motion. Holloway asked McGraw for advice on how best to secure the investment, as the investors were asking for documentation of U.S. Ventures' past performance. *Id.* McGraw explained that "[t]here is no past performance to release or audit. We need to move some money over to USVII NOW and start generating a track record. You can move my mother-in-laws over for that matter, but we have to do it now." *Id.* McGraw noted that moving funds from other investors into the account that was soliciting the new funds would create the false impression of past performance and accurate records, stating "[g]ood move my mother-in-laws and kyles accounts over. This is good because they are small and should be easy to fund USVII account with the whole principal. This way the USVII bank account and the trading account balance will reflect exactly the proper amount. If we do it now, we may get 90 days' worth of track record before we show them." *Id.*

24. In fact, McGraw's mother-in-law never invested in U.S. Ventures. McGraw has testified that he lied to Holloway by telling him an investment of funds came from his mother-in-law when in fact he now claims it was his own money. When asked why he lied to Holloway about this, McGraw testified: "I didn't want it to appear as a conflict and it was easier for me to say that it was someone else's investment than -- because I didn't want him to ask me for more money, I wanted to see how the investment worked out." McGraw Depo. at 69:8-17, attached as Exhibit 5 to the Motion; *see also* Excerpts from June 14, 2011 deposition of Forres McGraw in the case of *C.F.T.C. v. U.S. Ventures at al.*, Civil Action No. 2:11-cv-00099, United States District Court for the Northern District of Texas-Dallas Division ("McGraw CFTC Depo."), attached as Exhibit 24 to the Motion at 214:14-22 ("Yeah. And that was actually not my mother-in-law, but I didn't want him to know it was my money").

25. On December 12, 2006, McGraw sent Holloway a text message stating that one of McGraw's associates "figured out how to skirt securities classification of notes. we'll have to do it out of the bahamas." Holloway responded "on way to airport to nassau." *See* Text Message Log, attached as Exhibit 28 to the Motion, at 8; *see also id.* at 6 (messages from Holloway to McGraw "was 700k down last night at top," "up now," "have u dont[sic] firday?" "if not leave it out," "it will be carry," and from McGraw to Holloway "its done").

26. On February 15, 2007, Holloway sent McGraw an email informing him that Holloway expected to receive a $190,000,000 investment shortly and to discuss how to use those funds. February 15, 2007 email exchange between Bob Holloway and Forres McGraw, attached as Exhibit 29 to the Motion. McGraw noted that the investment would help them to "pull this out." *Id.* Holloway suggested using the funds to "catch up" a U.S. Ventures account and suggested that they move funds from the account of a large client to a different account "to reduce loss balance." *Id.*

27. On February 27, 2007, Holloway sent McGraw an email stating that "we are screwing up people[sic] lives with out[sic] incompetence" and stating that "[i]f we don't send out 5 reports next week it will be closed out and we will be completely out of business and I will be in jail." February 27, 2007 email from Bob Holloway to Bryan Bailey and Forres McGraw, attached as Exhibit 30 to the Motion.

28. McGraw repeatedly confirmed that the e-mail addresses and signature blocks used in these communications between Holloway and him were his. *See, e.g.*, McGraw Depo. at 75:6-8, 75:20-23, 83:14-84:1, 92:21-93:2, 95:4-6, 104:17-23, 118:18-21, 121:15-18, 145:24-146:3, attached as Exhibit 5 to the Motion. He also testified that he had no reason to believe that someone else would have been using these email addresses or to doubt that they were actually

sent and received as indicated. *See* McGraw CFTC Depo. at 87:17-25, attached as Exhibit 24 (testifying that McGraw had no reason to believe that someone else was using his email address or sending emails on his behalf), 190:13-17 (testifying that McGraw has no reason to doubt the emails were sent and received by him and Holloway).

29. McGraw also provided testimony demonstrating his knowledge that U.S. Ventures' was conducting fraudulent activities. McGraw CFTC Depo. at 23:3-24:17, attached as Ex. 24 to the Motion; *see also* McGraw Depo. at 26:7-29:4, attached as Exhibit 5 to the Motion. For example, the nature of U.S. Ventures' payments to McGraw should have put him on notice that its activities were not legitimate. McGraw testified that he had no contract with U.S. Ventures, never agreed to any specific amount of payment for his services, and didn't even discuss payment with Holloway. *Id.* Instead, Holloway would simply pay McGraw varying amounts each week with no apparent basis or method for determining the amount of payments, which McGraw conceded was "kind of strange," but also noted that Holloway "paid well." *Id.*

30. McGraw also testified that a report he prepared for U.S. Ventures showing a daily average return of .84% was "higher than – than you can get now, its higher than you could have gotten then." McGraw Depo. at 40:2-14, attached as Exhibit 5 to the Motion.

31. McGraw provided additional testimony showing that he was on notice of U.S. Ventures' improper conduct, including testifying that Holloway and U.S. Ventures "changed their distribution rules all the time," that Holloway often claimed that significant new investments would be coming in when they did not, and that U.S. Ventures "did not send 1099s or do any reporting." McGraw Depo. at 102:23-103:2; 116:1; 165:9-10, attached as Exhibit 5 to the Motion.

32. Despite this stark evidence that unrealistic returns were being reported, misrepresentations, inconsistent payments, and illegal activity, McGraw did nothing to investigate the source of U.S. Ventures' funds or its activities. *See* McGraw Depo. at 34:8-20, Ex. 5 ("Q. And you didn't do any inquiry as to how they – how U.S. Ventures was generating its returns for its investors? A. No"), 41:1-3 ("Q. How often did you talk with Robert Holloway about these returns of his investments? A. I generally didn't. I just got a number from him, plugged it in and did my calculation.")

## CONCLUSIONS OF LAW

1. U.S. Ventures made the transfers at issue to McGraw "with actual intent to hinder, delay, or defraud any creditor of" Winsome, as defined under the Uniform Fraudulent Transfer Act ("UFTA"), because U.S. Ventures operated as a Ponzi scheme at the time the transfers were made. Utah Code § 25-6-5(1)(a). *See S.E.C. v. Madison Real Estate Group, L.L.C.*, 647 F. Supp. 2d 1271, 1279 (D. Utah 2009) ("Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme." (quotation omitted)).

2. Demonstrating that a transfer was received in good faith and for reasonably equivalent value is an affirmative defense to an actual fraudulent transfer, and the burden is on Defendant to prove both the element of good faith and the element of value. *Wing v. Apex Holding Co.*, No. 2:09-CV-00022, 2009 WL 2843343, *5 (D. Utah Aug. 27, 2009) ("whether a defendant took payments from [the Ponzi scheme receivership entity] in good faith and for reasonably equivalent value is an affirmative defense. . . .").

3. The good faith and reasonably equivalent value components of this affirmative defense are separate issues that must be independently established by a recipient asserting this defense. *Id.*

4. With respect to the first element, the Tenth Circuit has held that, in the context of a Ponzi scheme, good faith "should be measured objectively and that if circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." *In re M&L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996) (quotation omitted and emphasis in original). In other words, "[a] transferee who reasonably should have known of a debtor's

insolvency or of the fraudulent intent underlying the transfer is not entitled" to a finding of good faith. *Id.* at 1336.

5. Here, the record shows that McGraw knew or should have known of U.S. Ventures' insolvency and fraud and that he made no inquiry regarding that fraudulent conduct. The fact that McGraw participated in dozens of communications in which Holloway and others demonstrate that they were fraudulently covering up losses at U.S. Ventures, running a Ponzi scheme, and that they were concerned about their illegal conduct. These include emails stating that "people will freak out when they see a 30% loss," that Holloway wanted McGraw to "send [him] a gun to eat," that Holloway made "big mistakes," that Holloway "will be in jail," and that McGraw's associate "figured out how to skirt securities classification of notes." McGraw participated in drafting reports and in conceiving strategies to hide those losses, such as failing to report trading days that lost money, moving funds from one account to another to hide losses, and using investments from new investors to pay old investors.

6. McGraw did not simply prepare spreadsheets, but was directly involved in U.S. Ventures' operations. He suggested accounting losses to an "unfunded reserve," created "distribution rules," proposed funding withdrawals with later investors' money, agreed to act as U.S. Ventures' CFO, wanted to transfer his "mother-in-law's" funds to create the appearance of past performance, prepared U.S. Venture reports to "equal null" on days without gains to hide losses, and helped open an offshore account for Holloway. McGraw was also plainly aware that U.S. Ventures was reporting unrealistic returns, including returns of 772% in a year, noting that U.S. Ventures was giving "the best return available on the planet," and preparing a report showing returns that he recognizes were not achievable at the time of the report. McGraw was also paid with fraudulently obtained funds in a sporadic manner at no set salary, without a

contract, and without ever discussing an agreed payment amount. Further demonstrating McGraw's knowledge of the impropriety of U.S. Ventures, he lied to Holloway in claiming that funds he invested were from his mother-in-law rather than his own because he believed investing his own money would create a conflict of interests and because he did not want Holloway asking him for money

7. Despite these many indications of McGraw's notice and knowledge that U.S. Ventures was a fraudulent operation, McGraw did nothing to investigate the propriety of the reports he was making and the funds he was receiving. Instead, he simply reported whatever unrealistic numbers Holloway told him to report and continued to assist Holloway in hiding losses without ever investigating the legality of the operation. McGraw cannot demonstrate that he conducted a "diligent inquiry" regarding U.S. Ventures' fraud. *In re M&L Bus. Mach. Co.*, 84 F.3d at 1338. Therefore, he is not entitled to a finding of good faith.

8. In *Wing v. Williams*, 2011 WL 891121, the court addressed a situation where, like McGraw, the defendant claimed to have provided reasonably equivalent value to a Ponzi scheme and therefore argued he was entitled to assert the "good faith" defense. The court agreed with the defendant in *Williams*, and its reasoning makes clear why McGraw cannot avail himself of the good faith defense. Specifically, the court in *Williams* found that the defendant acted in good faith because he "was never an officer, manager, employee or investor with any [Ponzi] entity," "did not give accounting advice," "believed that each of the projects were real, viable enterprises" based on authenticated documentation he was provided, "had no reason to question" the work of accounting firms that processed the entities' financial disclosures, "earned his regular fees," "was not an insider," and "was not an investor." *Id.* at *4-6. The court also noted that there was no evidence of "too-good-to-be-true interest rates, bounced checks, implausible

explanations, and post-dated payment checks." In contrast, McGraw, *inter alia*, invested his own funds in U.S. Ventures but lied about the source of those funds because he did not want the Ponzi scheme operator to ask him for more money and he was concerned about a conflict of interest, suggested that U.S Ventures create new accounts for trading as a means of hiding the history of prior losses, urged Holloway to create an "unfunded loss reserve," was paid in irregular amounts and irregular intervals, was aware of unrealistic returns, and was included on multiple communications in which Holloway made statements providing significant reason to believe that U.S. Ventures operated as a Ponzi scheme. Accordingly, McGraw did not receive the transfers at issue in good faith and, therefore, he is not entitled to assert the good faith defense.

9. With respect to the second element, the question of whether value is received is answered from the perspective of the tort creditors of Winsome, its defrauded investors. *In re Jordan*, 392 B.R. 428, 441 (Bankr. D. Idaho 2008) ("Whether a debtor received a reasonably equivalent value is analyzed from the point of view of the debtor's creditors, because the function of this element is to allow avoidance of only those transfers that result in diminution of a debtor's . . . assets."); *see also Donell v. Kowell*, 533 F.3d 762, 767 (9th Cir. 2008) (explaining that, in a Ponzi scheme, the Ponzi scheme operator is the "debtor," and each good faith investor in the scheme who has not regained his initial investment is a "tort creditor"). In other words, the question is not whether Defendant "gave reasonably equivalent value; it is whether [U.S. Ventures] *received* reasonably equivalent value." *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807 (9th Cir. 1995).

10. The only value McGraw claims to have provided in exchange for the transfers at issue is preparing certain spreadsheets related to U.S. Ventures' investors and purported returns

and losses on U.S. Ventures' trading, and that he may also have received payments from U.S. Ventures as returns on an investment he made with U.S. Ventures.

11. The reports McGraw provided to U.S. Ventures did not provide any value to the investors of U.S. Ventures, and these reports only served to further U.S. Ventures' fraudulent activities. Such services that further a fraudulent venture cannot satisfy the requirement of providing reasonably equivalent value. *See Wing v. Holder*, No. 2:09-CV-118, 2010 WL 5021087, *2 (D. Utah Dec. 3, 2010) (rejecting argument that defendant provided reasonably equivalent value to Ponzi entity by referring investors because he had "received money for essentially prolonging the fraud of and on the [Ponzi] entities"). Also, any investment made by McGraw was minimal in comparison to the total amount of money he was paid by U.S. Ventures.

12. Therefore, because the transfers to McGraw at issue were made by U.S. Ventures while it operated as a Ponzi scheme, because U.S. Ventures did not receive reasonably equivalent value from McGraw in exchange for these transfers, and because McGraw did not receive the transfers in good faith, the Court holds that the transfers at issue were actual fraudulent transfers under Utah Code Ann. § 25-6-5(1)(a).

13. A transfer can also be avoided as a constructive fraudulent transfer if (1) "the debtor made the transfer . . . without receiving reasonably equivalent value in exchange" and (2) the transferor could not pay its debts as they became due. Utah Code Ann. § 25-6-5(1)(b).

14. As discussed above, U.S. Ventures did not receive reasonably equivalent value in exchange for the transfers at issue.

15. Proof of U.S. Ventures operating as a Ponzi scheme also shows that it "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due." *Donell*, 533 F.3d at 770.

16. Therefore, the Court holds that the transfers at issue were constructively fraudulent under Utah Code Ann. § 25-6-5(1)(b)

17. Because the Court finds that transfers may be avoided as actual or constructive fraudulent transfers, the Court declines to decide the issue of whether McGraw is liable on the unjust enrichment claim made by the Receiver.

18. Therefore, the Motion for Summary Judgment filed by the Receiver is GRANTED.

19. Accordingly, judgment is hereby entered against Defendant and in favor the Receiver in the amount of $123,598.00, with post-judgment interest accruing at the legal rate, plus the Receiver's costs incurred in bringing this lawsuit.

IT IS SO ORDERED.

DATED this 17th day of april, 2014.

BY THE COURT:

Judge Bruce S. Jenkins

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing **PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT** to be served in the method indicated below this 14th day of April, 2014, addressed as follows.

| | |
|---|---|
| ___HAND DELIVERY | Forres McGraw |
| _x_U.S. MAIL | 5427 Preston Haven Dr. |
| ___OVERNIGHT MAIL | Dallas, TX 75229 |
| ___FAX TRANSMISSION | forres@outlook.com |
| _x_E-MAIL TRANSMISSION | Defendant *pro se* |
| __USDC ECF NOTICE | |

/s/ David C. Castleberry